IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATHAN S. LEONARD, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-21-1464 |
| TOWSON UNIVERSITY, et al., | * | |
| Defendants. | * | |
| | * | |

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Towson University, Carol Watts, and Michael Bachman's Motion to Dismiss Amended Complaint (ECF No. 27). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant the Motion in part and deny the Motion in part.

## I.   BACKGROUND[1]

### A.   Factual Background

Plaintiff Nathan S. Leonard worked for Defendant Towson University ("Towson") in different capacities from 2009 until April 23, 2021. (Am. Compl. ¶¶ 1, 7, 8, 110, ECF No. 18). In June 2014, Towson hired Leonard as a Technology Generalist. (Id. ¶ 9). Leonard has been diagnosed with depression and anxiety, and the office Towson initially

---

[1] Unless otherwise noted, the Court takes the following facts from the Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

accommodated his disabilities. (Id. ¶¶ 9–10). Specifically, the office provided "a window with natural sunlight, a door that could be closed for privacy, and it was in a quiet area of the building." (Id. ¶ 11).

In April 2017, Leonard sought treatment for his disabilities. (Id. ¶ 12). Two months later, Leonard informed Towson of his disability and sought a formal accommodation to "cement and codify the accommodations he was already coincidentally receiving." (Id. ¶ 13). In August 2017, Leonard's supervisor, Defendant Carol Watts, informed Leonard that Towson was relocating him to a new space. (Id. ¶ 16). His new office did not have "natural light windows," but instead had "intrusive windows which limited the effectiveness of the door." (Id. ¶ 17). Further, it was "connected to a large lobby which was quite loud." (Id.). For these reasons, the new office did not meet with his doctor's recommendation. (Id. ¶ 18).

After Leonard moved into the space in September 2017, he contacted Michelle Dacey, Human Resources representative, to discuss the accommodations he had requested. (Id. ¶ 19). They met the following month and discussed the recommendations of Leonard's physician. (Id. ¶¶ 20–21). During the meeting, Dacey informed Leonard that Michael Bachman, Leonard's third-line supervisor, did not support making changes to Leonard's work setting to satisfy his requested accommodations. (Id. ¶ 22). Instead, Bachman preferred that Leonard be "'close to the labs, close to the [lobby] desk' where someone [would] be 'aware of his comings and goings.'" (Id. ¶ 23). On November 7, 2017, Leonard contacted Dacey to complain that Towson had failed to engage in a good faith interactive process with him regarding his requested accommodations and, as a result, he asked that

she escalate his request to the "ADA coordinator or Fair Practices Officer." (Id. ¶ 26). Less than a week later, on November 13, 2017, Leonard was moved back to his original office. (Id. ¶ 27).

In January 2018, Watts began to subject Leonard to increased scrutiny by asking him "questions about his work and the amount work he was doing in a day." (Id. ¶ 28). These practices escalated the following month, with Watts checking in on him as many as five times per day. (Id. ¶ 29). In March 2018, Leonard was reprimanded for not promptly responding to a support request, despite the fact that he was not at work at the time due to a disability-related medical appointment. (Id. ¶¶ 30–32). The following day, Watts told Leonard that Towson was once again relocating him to Office #209, which Dacey had previously determined was "not suitable" for Leonard's accommodation requirements. (Id. ¶¶ 24, 33). Leonard responded by informing Watts that he was going to file a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 34). Also in March 2018, Leonard was asked to begin using Towson's timekeeping program, while his coworkers were not similarly monitored. (Id. ¶¶ 44–45).

On April 3, 2018, the day after Leonard filed his EEOC charge, he arrived at work ten minutes late, and Watts told him to "'mark it on [his] timesheet' despite the fact that [Leonard] [was] a salaried employee who [was] not paid by the hour, and had no previous attendance issues." (Id. ¶ 35). The next day, Watts told him that she would begin to require him to meet the "lofty goals" on his performance report, which Leonard had previously failed to meet without issue. (Id. ¶ 37). Watts also required Leonard to sign an unusual and apparently ad hoc "Expectation Agreement" created by Bachman that required Leonard to

meet those goals. (Id. ¶ 38). The following week, Watts required Leonard to provide proof that he attended a training, something she had never previously requested. (Id. ¶ 40). Watts also required that Leonard begin to request permission before using leave, another novel requirement and one to which his coworkers were not subjected. (Id. ¶ 41). Watts continued to strictly monitor Leonard's attendance and timeliness over the coming weeks. (Id. ¶¶ 45–46).

In July 2018, Leonard was given additional work, including menial tasks, despite an already large workload. (Id. ¶¶ 49–50). Indeed, Leonard "was handling more than 100x as many tickets as the other technician with the same job title." (Id. ¶ 51). Bachman told Leonard that he needed to "toughen up" in the face of the additional work. (Id.). Leonard discussed his workload with another colleague, who confirmed that his workload was much lighter and that Watts frequently brought up Leonard's accommodation requests. (Id. ¶ 52).

On November 26, 2018, Watts instituted a twice-weekly meeting with Leonard, another requirement to which Leonard's coworkers were not subjected. (Id. ¶ 55). Leonard responded by expressing that he felt he was being discriminated and retaliated against, but Watts countered that she was simply "managing [him]." (Id.). On December 4, 2018, Watts warned Leonard, without being specific, that she had been "taking pictures of his 'undone work.'" (Id. ¶ 56). On December 13, 2018, Leonard met with Watts and again expressed that he considered her behavior discriminatory and retaliatory. (Id. ¶ 57). Less than a week later, Watts began requiring Leonard to fill out a weekly "report form" that included specific reporting not required of Leonard's coworkers. (Id. ¶ 58). The following day, Watts advised Leonard that she did not think he was "doing enough work or completing

enough performance goals." (Id. ¶ 59). Leonard provided Watts his attorney's business card and she yelled and forced him to leave her office. (Id. ¶ 60).

For a period of approximately three weeks in January 2019, Watts stopped communicating with Leonard verbally, instead conducting all business with him via email. (Id. ¶¶ 61, 63). On January 8, 2019, Towson moved Leonard to another new office with "no accommodations," which "was in a loud basement with no natural light and without a door that closed." (Id. ¶ 62). Leonard also believed that in January 2019, Watts was "randomly disconnect[ing]" cables, perhaps in an effort to create additional work for Leonard. (Id. ¶¶ 64–65). Leonard further learned that month that Watts was manually clocking Leonard out thirty minutes early every day in Towson's electronic timekeeping system. (Id. ¶ 66). On January 17, 2019, in response to these actions, Leonard emailed Towson Vice President Benjamin Lowenthal to complain that he was being subjected to a hostile work environment and that Towson was not affording him reasonable accommodations. (Id. ¶ 67). Lowenthal responded by assuring Leonard he would investigate his concerns. (Id. ¶ 68).

Less than two hours after Leonard received the email from Lowenthal, he heard from his second-line supervisor, Julie Leary, who provided him with two written reprimands—the first such reprimands he had received during his employment with Towson. (Id. ¶ 69). On January 25, 2019, Leonard met with another Human Resources representative, Robbi Hairston-Flood, to discuss the concerns he raised with Lowenthal. (Id. ¶ 71). At the end of January 2019, Towson moved Leonard back to Office #209. (Id. ¶ 72).

On February 7, 2019, Watts verbally reprimanded Leonard for not completing an impossible service request. (Id. ¶ 73). The following day, Leonard emailed Hairston-Flood and Human Resources Director Steve Jones to again complain that Towson was not granting him reasonable accommodations and that he was facing retaliation and a hostile work environment. (Id. ¶ 74). On February 15, 2019, Towson General Counsel Sara Slaff responded to Leonard and told him that Towson had met his accommodation requests, notwithstanding the fact that Office #209 did not meet his physician recommendations. (Id. ¶ 77).

On April 4, 2019, Bachman implemented a new office sign-in sheet and specifically requested that Kevin Burns, Leonard's new direct supervisor, ensure Leonard use the sign-in sheet. (Id. ¶ 82). Although nominally all members of Leonard's department were supposed to use the sign-in sheet, Leonard was the only one against whom it was enforced. (Id. ¶ 83). On April 5, 2019, Leonard made a complaint with Towson's Office of Inclusion and Institutional Equity ("OIIE") about the apparently discriminatory enforcement of the sign-in sheet, but did not receive a response. (Id. ¶ 84). The following week, Bachman made use of the sign-up sheet into an official departmental directive for the first time in seven years. (Id. ¶ 86). On May 1, 2019, Leonard met with an OIIE investigator to express his ongoing concerns about discrimination and retaliation. (Id. ¶ 87).

Between May 3 and 6, 2019, Leonard met several times with Nate Barker, the Employee Labor Relations Manager. (Id. ¶ 88–90). During the last of these meetings, Barker informed Leonard that Towson was placing Leonard on administrative leave and requiring him to take a fitness-for-duty exam. (Id. ¶ 90). When Leonard took the exam on

May 8, 2019, the examiner questioned why Leonard has been subjected to the exam. (Id. ¶ 92). Leonard remained on administrative leave from May 6 to 28, 2019. (Id. ¶ 93). At a departmental picnic on June 1, 2019, Leonard was ostracized by his colleagues, which he believes was a result of the reputational damage caused by his administrative leave. (Id. ¶ 94). On July 15, 2019, Leonard met with Burns to again request accommodations, specifically raising his placement on Office #209. (Id. ¶ 97). After this conversation, Leonard began to observe "intense scrutiny" from Burns, including Burns repeatedly mentioning the importance of using the sign-in sheet to Leonard on July 17, 2019. (Id. ¶ 99). Two days later, on July 19, 2019, Leonard officially submitted a complaint to OIIE complaining of discrimination and retaliation by Burns. (Id. ¶ 100). On July 22, 2019, Leonard "was moved to a small boiler room office (334A) with no accommodations that also included the only Roof Access in the building." (Id. ¶ 101). That same day, Barker informed Leonard that the move had been an error and Leonard was moved back to his original office, which accommodated his disabilities. (Id. ¶ 102).

In August and September 2019, Leonard complained to OIIE of Towson selectively enforcing the sign-in sheet against him. (Id. ¶¶ 103, 105). Indeed, Leonard observed that while Towson continued to require him to use the sign-in sheet, not even the student workers were subject to a similar requirement. (Id. ¶ 104). Beginning in September 2019, Leonard also noticed that Burns began avoiding him. (Id.). Leonard was also excluded from two all-hands staff meetings between February 2019 and January 2020. (Id. ¶¶ 79, 106). At the end of January 2020, Leonard again complained to OIIE of Burns' discriminatory treatment. (Id. ¶ 107). Between January and March 2020, Towson continued to selectively

enforce use of the sign-in sheet against Leonard. (Id. ¶ 109). Finally, on April 23, 2021, Leonard resigned after determining that he was working "under conditions which any reasonable person would resign." (Id. ¶ 110).

B.    **Procedural Background**

Leonard filed his original Complaint on June 11, 2021. (ECF No. 1). Defendants moved to dismiss the Complaint on September 30, 2021. (ECF No. 5). In response, on November 18, 2021, Leonard filed an Amended Complaint under Federal Rule of Civil Procedure 15(a)(1)(B). (ECF No. 18).

Leonard's five-count Amended Complaint alleges: failure to accommodate in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. (the "Rehabilitation Act") (Count I); disability discrimination in violation of the Rehabilitation Act (Count II); retaliation (Count III); hostile work environment against Towson (Count IV);[2] and hostile work environment against Watts and Bachman ("Individual Defendants") in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA") (Count V). (Id. ¶¶ 112–65). Leonard seeks declaratory and injunctive relief, backpay, economic and compensatory damages, and attorneys' fees and costs. (Am. Compl. at 21).

On November 18, 2021, Defendants filed the instant Motion to Dismiss Amended Complaint (ECF No. 27). Leonard filed an Opposition on March 28, 2022, (ECF No. 31), and on April 12, 2022, Defendants filed a Reply (ECF No. 37).

_____

[2] The Amended Complaint identifies "Defendant County" as the target of Count IV. (See Am. Compl. at 19). As there is no county defendant in this case, this reference appears to be a scrivener's error, and the Court will assume for the purposes of this Opinion that Leonard intended to name Towson as the subject Defendant of Count IV.

## II.   DISCUSSION

**A.    Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, "the complaint must allege sufficient facts to establish [each] element." Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid

of any reference to actual events, see United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions "couched as factual allegations", Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

## B.   Analysis

Defendants advance four arguments in support of their Motion: (1) Leonard's claims are time-barred under the applicable statutes of limitations; (2) Leonard's hostile work environment claims do not state a claim for which relief may be granted; (3) Leonard's disability discrimination claim does not state a claim for which relief may be granted; and (4) Leonard's retaliation claim fails to state a claim for which relief may be granted. The Court will first outline the legal framework applicable to Leonard's claims and then address each of Defendants' arguments in turn.

### 1.   Timeliness

Defendants first argue that Leonard's claims are barred under the applicable statutes of limitations. At bottom, the Court finds that Leonard's failure to accommodate claim (Count I) is time-barred, but his remaining claims are not.

#### a.   Failure to Accommodate

Rehabilitation Act claims in Maryland are subject to a two-year statute of limitations. See Ott v. Md. Dep't of Pub. Safety & Corr. Servs., 909 F.3d 655, 660 (4th Cir. 2018). Leonard filed this lawsuit on June 11, 2021; accordingly, a failure to accommodate that occurred prior to June 11, 2019, would no longer be actionable. Defendants argue that the Amended Complaint does not contain any allegation of a failure to accommodate that occurred after June 11, 2019. (See Mem. L. Supp. Defs.' Mot.

Dismiss Am. Compl. ["Mot."] at 7–8, ECF No. 27-1). Leonard appears to concede this point in his Opposition but argues that the Court should nevertheless allow the claim to survive on two bases: (1) the continuing violation doctrine; and (2) equitable tolling. (Pl.'s Mem. Opp'n Defs.' Mot. Dismiss Pl.'s Am. Compl. ["Opp'n"] at 4, 8 (ECF No. 31). Both arguments fail.

First, Leonard argues that his claims are subject to the continuing violation doctrine. (Id. at 4). It is true that, in the context of hostile work environment claims, the Supreme Court has permitted otherwise untimely actions to form the basis for a plaintiff's claim under the continuing violation doctrine. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day."); see also U.S. Equal Emp. Opportunity Comm'n v. Phase 2 Invs. Inc., 310 F.Supp.3d 550, 574 (D.Md. 2018) (finding that the Court "can consider actions that contributed to the hostile work environment but occurred prior to [the bounds of the statute of limitations], under the continuing violation doctrine"). In such claims, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Morgan, 536 U.S. at 117.

Leonard thus argues that because his allegations include conduct that occurred within the limitations period, his Rehabilitation Act claim is timely. (Opp'n at 5–6). As discussed infra, with respect to his hostile work environment claims, Leonard is clearly correct. But the continuing violation doctrine does not apply to failure to accommodate

claims. Hill v. Hampstead Lester Morton Ct. Partners, LP, 581 F.App'x 178, 181 (4th Cir. 2014); see Raiford v. Md. Dep't of Juv. Servs., No. DKC-12-3795, 2014 WL 4269076, *7 (D.Md. Aug. 28, 2014) (citing cases). Accordingly, the continuing violation doctrine cannot save Leonard's failure to accommodate claim.

Leonard next argues that he is entitled to equitable tolling on his failure to accommodate claim. (Opp'n at 8–10). Equitable tolling of limitations periods is permitted when "due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir.2003) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)). "[T]o be entitled to equitable tolling, an otherwise time-barred petitioner must present '(1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time.'" United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004) (quoting Rouse, 339 F.3d at 246). Leonard describes a misconception that formed due to certain information on the EEOC website and on the EEOC's notice of right-to-sue letter that implied that he could file suit anytime within ninety days of receiving the right-to-sue letter. (Opp'n at 9–10). According to Leonard, these documents gave him "every reason to believe that all his facts were accepted as valid and legitimate ones to be included in a lawsuit." (Id. at 10).

Critically, however, "a party's misconception about the operation of the statute of limitations is neither extraordinary nor a circumstance external to [the plaintiff's] control." Ott, 909 F.3d at 661. Indeed, "[i]gnorance of the law does not justify tolling, even when a party does not have legal representation." Id. "Similarly, an attorney's mistake in

interpreting a statute does not amount to an extraordinary circumstance." Id. Further, as this Court held in another Rehabilitation Act case, "the fact that plaintiff filed a Charge of Discrimination with the EEOC does not create the type of 'exceptional circumstances' which warrant equitable tolling." Ott v. Md. Dep't of Pub. Safety & Corr. Servs., No. RDB-16-3394, 2017 WL 3608181, at *5 (D.Md. Aug. 22, 2017), aff'd, 909 F.3d 655 (4th Cir. 2018); see also Harris v. O'Malley, No. WDQ-13-2579, 2015 WL 996557, at *5 (D.Md. Mar. 4, 2015) ("Because Harris was not required to pursue her EEOC Charge before filing this suit, the statute of limitations was not tolled."), aff'd sub nom., 670 F.App'x 108 (4th Cir. 2016). The Court therefore declines to equitably toll the statute of limitations applicable to Leonard's Rehabilitation Act claim. Accordingly, Leonard's failure to accommodate claim does not allege a timely violation of the Rehabilitation Act and must be dismissed.

### b.    Hostile Work Environment Claims

As set forth above, the continuing violation doctrine applies to hostile work environment claims. The Amended Complaint contains allegations in support of a hostile work environment that occurred between October 25, 2017 and March 30, 2020. (See Am. Compl. ¶¶ 22, 109). Leonard filed his EEOC charge on April 2, 2018. (Am. Compl. ¶ 34; EEOC Dismissal & Notice Rights ["Right-to-Sue Letter"] at 1, ECF No. 11-3). Employees pursuing ADA claims arising in Maryland must file an EEOC charge within 300 days of the allegedly unlawful conduct. See 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117 (incorporating Title VII's administrative exhaustion requirement). Thus, regardless of

whether Leonard brought his hostile work environment claims under the Rehabilitation Act or the ADA, those claims were timely.

### c.    Disability Discrimination and Retaliation Claims

Finally, the Court turns to Leonard's claims of disability discrimination and retaliation (Counts II & III). Among other things, both claims incorporate the allegation that Leonard was constructively discharged due to discriminatory and retaliatory animus. (See Am. Compl. ¶¶ 110, 128, 135). The alleged constructive discharge occurred on April 23, 2021. (Id. ¶ 110). Further, both counts incorporate Leonard's claims of a hostile work environment. (See id. ¶¶ 128, 138); see also Vedula v. Azar, No. TDC-18-0386, 2020 WL 5500279, at *15 (D.Md. Sept. 11, 2020) (describing the elements of a retaliatory hostile workplace environment claim). Thus, to the extent the claims are premised in part on Leonard's claims that he was subjected to a hostile work environment and constructive discharge—which, construing the factual allegations in the light most favorable to Leonard, they are—the claims are timely.

In sum, the Court finds that Leonard's failure to accommodate claim (Count I) is time-barred and will dismiss the claim on those grounds. The Court declines to dismiss the balance of the Amended Complaint on timeliness grounds.

### 2.    Hostile Work Environment Claims (Counts IV, V)

Because Leonard's hostile work environment claims appear to be incorporated into his disability discrimination and retaliation claims, the Court will evaluate those claims first.

14

### a.      Hostile Work Environment – Individual Defendants (Count IV)

Defendants argue that Leonard's hostile work environment claim cannot prevail against the Individual Defendants for two reasons. First, Defendants argue that ADA does not permit suit against individual employees in their individual capacities. (Mot. at 17). Second, Defendants argue that to the extent Leonard intends to bring the claims against Individual Defendants in their official capacities, such claims are barred by the Eleventh Amendment. At bottom, the Court agrees and will dismiss Count V.

First, Defendants are correct that ADA does not provide a cause of action against individual employees. See King v. Schrader, No. DKC-16-3804, 2017 WL 3730335, *3 (D.Md. Aug. 30, 2017) (dismissing ADA claims against individual employees of Maryland Department of Health in their individual capacities because "the ADA does not authorize suit against individuals for violating its provisions" (quoting Altevorgt v. Kirwan, No. WDQ-11-1061, 2012 WL 135283, *4 (D.Md. Jan. 13, 2012))); Jones v. Sternheimer, 387 F.App'x 366, 368 (4th Cir. 2010) ("Title VII, the ADA, and the ADEA . . . do not provide for causes of action against defendants in their individual capacities."). Thus, Leonard's claims cannot proceed against Individual Defendants in their individual capacities.

Leonard has also failed to state a viable claim against Individual Defendants in their official capacities. "State officers sued in their official capacity are . . . entitled to Eleventh Amendment immunity because such a suit 'is not a suit against the official but rather is a suit against the official's office.'" Just Puppies, Inc. v. Frosh, 438 F.Supp.3d 448, 482 (D.Md. 2020) (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989)). In Ex parte Young, 209 U.S. 123 (1908), however, the Supreme Court created an exception to

Eleventh Amendment immunity for claims seeking prospective [injunctive] relief. As the Supreme Court has explained, the Ex parte Young exception "permits suits for prospective injunctive relief against state officials acting in violation of federal law." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004). "The Ex parte Young exception . . . applies only when there is an ongoing violation of federal law that can be cured by prospective injunctive relief. It does not apply when the alleged violation of federal law occurred entirely in the past." DeBauche v. Trani, 191 F.3d 499, 505 (4th Cir. 1999).

Defendants argue that Leonard's ADA claim against Individual Defendants must fail because Leonard has not alleged facts showing an ongoing violation of federal law by Individual Defendants. (Mot. at 17–19). Defendants are correct. Leonard argues that "the ongoing violation underlying Plaintiff's claim is the repeated denial and reinstatement of rights to the Plaintiff," and that "[t]he back and forth Plaintiff endured is itself an ongoing violation of federal law." (Opp'n at 14–15). These arguments miss the mark. Leonard does not allege a single instance of an ongoing hostile work environment that occurred after March 30, 2020. Indeed, he could not plausibly allege the presence of an ongoing "hostile work environment" in a place he no longer works. The Court thus cannot find the presence of an ongoing violation. Accordingly, Count V is barred by the Eleventh Amendment and must be dismissed.

### b.   Hostile Work Environment – Towson (Count IV)

The Court next turns to the hostile work environment claim against Towson (Count IV). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117. To

establish a discriminatory hostile work environment claim, Leonard must demonstrate: "(1) [he] experienced unwelcome harassment; (2) the harassment was based on [his] [disability]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019). In determining whether a plaintiff's hostile work environment claim can survive a motion to dismiss, courts look to "all the circumstances[,] [which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [N]o single factor is required." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The Court "can consider actions that contributed to the hostile work environment but occurred prior to [the bounds of the statute of limitations], under the continuing violation doctrine." Phase 2 Invs., 310 F.Supp.3d at 574.

Defendants argue that Leonard's hostile work environment claim fails because he has not alleged sufficiently severe or pervasive harassment. (Mot. at 14). At bottom, the Court disagrees and will permit Leonard's claim of hostile work environment to proceed to discovery.

"The severe or pervasive element has both a subjective and objective component." Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019). Accordingly, Leonard must demonstrate that he "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." Id. (quoting E.E.O.C. v. Cent. Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009)). The severe or pervasive standard sets a "high bar." Id.

(quoting <u>E.E.O.C. v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir. 2008)). "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable under Title VII." <u>Sunbelt Rentals</u>, 521 F.3d at 315–16 (citations omitted). Further, "offhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Perkins</u>, 936 F.3d at 208 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)). Indeed, even the utterance of an epithet may not, on its own, be enough to alter the conditions of employment under Title VII. <u>Id.</u> Rather, a hostile work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult.'" <u>Lambert v. Savaseniorcare Admin. Servs., LLC</u>, No. DLB-20-2768, 2022 WL 3027993, at *13 (D.Md. July 29, 2022) (quoting <u>Harris</u>, 510 U.S. at 21).

Leonard's hostile work environment claim rests on the following allegations: in August 2017, Defendants moved Leonard to an office without natural light in a high-traffic area, which conflicts with Plaintiff's recommended accommodations, (Am. Compl. ¶¶ 16–18); beginning in January 2018, Watts subjected Leonard to increased scrutiny about his work, (<u>id.</u> ¶¶ 28–29); Defendants reprimanded Leonard for attending a doctor's appointment in accordance with his reasonable accommodations, (<u>id.</u> ¶¶ 30–31); Defendants moved Leonard to an unsuitable office that did not fit his reasonable accommodations requirements, (<u>id.</u> ¶ 33); Defendants reprimanded Leonard for a late arrival despite Leonard's status as a salaried employee, and further reprimanded Leonard for not answering emails on his day off, (<u>id.</u> ¶¶ 35–36); Defendants imposed unreasonable

18

performance goals on Leonard, (id. ¶ 37); Defendants subjected Leonard to unusually close scrutiny and excluded him from a professional development conference, (id. ¶¶ 44–47); Defendants unfavorably compared Leonard's performance data to the combined data for all the other technicians Towson employed, (id. ¶ 59); Defendants assigned Leonard to work in a new office on main campus that did not meet his accommodation needs, (id. ¶ 62); Watts manually clocked Leonard out thirty minutes early each day via Towson's electronic timekeeping system, (id. ¶ 66); Defendants reprimanded Leonard less than two hours after he lodged a hostile work environment complaint, (id. ¶ 69); Defendants placed Leonard on administrative leave and required him to take a fitness for duty exam, (id. ¶ 90); Leonard's supervisor treated him "with caution," directed him to follow certain procedures concerning hard drive disposal, and subjected his work to "intense scrutiny," (id. ¶¶ 96–99); Towson mistakenly moved Leonard to a small boiler room office for less than a full day, (id. ¶¶ 101–102, 110); and Leonard's supervisor failed to invite him to a meeting and selectively required him to use a sign-in sheet, (id. ¶¶ 104, 106, 109). These events occurred over a period of roughly two-and-a-half years. (See id. ¶¶ 19, 109).

In the Court's view, although the decision is close, the allegations in the Amended Complaint state a plausible claim of hostile work environment. In sum, Leonard has alleged that between September 2017 and March 2020, Towson subjected him to extraordinary selective scrutiny over a period of years, repeatedly ignored and rejected his accommodation requests for periods of varying length, excluded him from meetings and conferences, manipulated his timekeeping records, subjected him to an unnecessary fitness-for-duty exam, and kept him from professional development opportunities. Taken

together, these actions constitute more than "rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor." Sunbelt Rentals, 521 F.3d at 315–16. Rather, a reasonable person could view the pattern of behavior as frequent, severe, humiliating, and as "unreasonably interfere[ing] with [Leonard's] work performance." Harris, 510 U.S. at 23.

To be sure, Defendants have cited several cases in which this Court has found that serious allegations of harassment did not amount to a hostile work environment and implore the Court to reach a similar conclusion here. (See Mot. at 15). Although this Court has previously addressed the question, the Court finds that a reasonable juror could conclude from these factual allegations that Leonard was subjected to an abusive atmosphere. The Court declines to substitute its judgment regarding the pervasiveness or severity of Defendants' conduct for that of the jury, particularly at this early stage. Accordingly, the Court will not dismiss Leonard's hostile work environment claim against Towson.

### 3.    Disability Discrimination (Count II)

In Count II of the Amended Complaint, Leonard alleges that Towson subjected him to unlawful disability discrimination in violation of the Rehabilitation Act. (See Am. Compl. ¶¶ 130–34). In order to make a prima facie case for disability discrimination, a plaintiff must allege: "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for employment in question, and (3) that [his] employer discharged [him] or took other adverse employment action because of [his] disability." Lacasse v. Didlake, Inc., 712

F.App'x 231, 238–39 (4th Cir. 2018).[3] Defendants argue that Leonard has failed to allege that he suffered an adverse employment action because of his disability. (Mot. at 9). Leonard counters that he suffered two adverse actions: a hostile work environment and a constructive discharge. (Opp'n at 11–12). Defendants first argue that Leonard has failed to state a claim for constructive discharge. At bottom, the Court agrees.

A constructive discharge, of course, would constitute an adverse action under the Rehabilitation Act. See Green v. Brennan, 578 U.S. 547, 553 (2016) (finding that a constructive discharge may serve in a discrimination claim as the "matter alleged to be discriminatory"); Lloyd v. Riveredge Operating Co., No. GLR-20-3162, 2021 WL 2550495, at *4 (D.Md. June 21, 2021) ("[C]onstructive discharge is an adverse action which can fulfill that element of [a plaintiff's] discrimination or retaliation claims.").

To establish a constructive discharge, "a plaintiff must show 'that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign' and that she actually resigned." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019) (alterations in original) (quoting Green, 578 U.S. at 555). The conditions must go "beyond 'ordinary' discrimination." Id. (quoting Penn. State Police v. Suders, 542 U.S. 129, 147 (2004)). Courts evaluating constructive

---

[3] Although Leonard asserts his claims under the Rehabilitation Act the Court may rely on decisions analyzing claims under the ADA because "[t]he scope of liability under the ADA is generally the same as that under the Rehabilitation Act" and "[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts." Wood v. Md. Dep't of Transp., 732 F.App'x 177, 181–82 (4th Cir. 2018) (quoting Baird ex rel. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999)).

discharge claims must consider whether a plaintiff's workplace was so intolerable that she was compelled to resign under an objective, "reasonable person" standard. Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006). "However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. (quoting James v. Booz–Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004). Moreover, "[i]n assessing intolerability, the frequency of the conditions at issue is important." Evans, 936 F.3d at 193. Thus, "[t]he more continuous the conduct, the more likely it will establish the required intolerability," but "when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." Id. Finally, the Fourth Circuit has advised that courts should consider "the totality of the circumstances" in determining whether a resignation was, in fact, a constructive discharge. See Bodkin v. Town of Strasburg, 386 F.App'x 411, 413 (4th Cir. 2010).

Leonard argues that the same facts establishing his hostile work environment claim support a claim of constructive discharge. (Opp'n at 12). Defendants counter that Leonard cannot state a claim of constructive discharge where the last discriminatory act occurred over a year prior to his resignation. (Mot. at 9). Defendants are correct. "To prevail under a constructive discharge theory, a party must resign within a reasonable time after the last act of discrimination." Fry v. Prince George's Cnty., No. AW-05-3150, 2008 WL 9359927, *3 (D.Md. Nov. 18, 2008); see also Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir. 1997) (finding that a seventeen-month gap between the alleged hostile actions and the plaintiff's resignation "objectively bel[ied] [the plaintiff's] assertion that

she was forced to resign"); <u>Landrau-Romero v. Banco Popular de Puerto Rico</u>, 212 F.3d 607, 613 (1st Cir. 2000) (holding that "[i]f a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged," and finding that a seven-month gap was too long to support a claim of constructive discharge). Here, the last act of harassment Leonard alleges occurred on or before March 30, 2020. (Am. Compl. ¶ 109). Leonard did not resign until April 23, 2021. (<u>Id.</u> ¶ 110). A plaintiff cannot state a claim for constructive discharge in the face of such a lengthy temporal gap.

The Court therefore finds that Leonard has not adequately alleged that he was constructively discharged. As set forth above, however, the Court finds that Leonard has alleged a hostile work environment claim against Towson. A hostile work environment constitutes an actionable adverse employment action. <u>See</u> <u>Morgan</u>, 536 U.S. at 117 (2002) ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"). Thus, Leonard's disability discrimination claim may proceed with a hostile work environment as the subject adverse employment action. Of course, given that the only "adverse action" surviving to support Leonard's disability discrimination claim is his hostile work environment claim against Towson, Count II is for all practical purposes wholly subsumed into Count IV. But the claims are separately articulated in the Amended Complaint and the Court sees no reason to dismiss Count II at this time. Accordingly, Defendants' Motion will be denied as to Count II.

### 4.        Retaliation (Count III)

Finally, the Court turns to Leonard's claim of retaliation (Count III). To succeed on a retaliation claim under the ADA or the Rehabilitation Act, the plaintiff must ultimately prove that: "(1) he engaged in protected conduct; (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Schmidt v. Town of Cheverly, 212 F.Supp.3d 573, 580 (D.Md. 2016) (quoting Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 154 (4th Cir. 2012)).

As with Leonard's discrimination claim, Defendants argue that Leonard has failed to allege facts sufficient to establish that he suffered an adverse action. (Mot. at 9). An adverse employment action is a discriminatory act that "adversely affect[s] the terms, conditions, or benefits' of the plaintiff's employment." James, 368 F.3d at 375 (citing Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001)). In retaliation cases, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (2006)) (internal quotation marks omitted). Thus, the burden of establishing an adverse action in a retaliation claim is lower than that of discrimination. See Burlington N., 548 U.S. at 64–67 ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment. . . . The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").

As the Court has already found that Leonard has stated a claim for hostile work environment, it rejects Defendants' argument that he has failed to allege an adverse action. See Von Gunten v. Maryland, 243 F.3d 858, 869–70 (4th Cir. 2001) ("Retaliatory harassment can constitute adverse employment action."), overruled on other grounds by Burlington N., 548 U.S. at 67–68; Carrico v. Prince George's Cnty. Gov't, No. TDC-17-0822, 2020 WL 1434102, at *3 (D.Md. Mar. 24, 2020) ("[T]he creation of a hostile work environment can constitute a materially adverse action for purposes of a retaliation claim.").[4] Accordingly, the Court declines to dismiss Leonard's retaliation claim.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss Amended Complaint (ECF No. 27). A separate Order follows.

Entered this 30th day of August, 2022.

_____/s/_____.

George L. Russell, III
United States District Judge

---

[4] The Court notes that in his Opposition, Leonard argues that it constituted an actionable adverse employment action when Towson relocated his office to the boiler room. (Opp'n at 12–13). The Court disagrees that this action, standing alone, constitutes an adverse employment action even under the relaxed standard applicable to retaliation claims. Leonard was in the boiler room for less than a full day. Such a minor and brief inconvenience cannot possibly be significant enough to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68.